RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0313p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JESSE PEOPLES,

        *Petitioner-Appellant,*

        *v.*

BLAINE LAFLER, Warden,

        *Respondent-Appellee.*

No. 11-2161

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:06-cv-12281—Bernard A. Friedman, District Judge.

Argued: July 25, 2013

Decided and Filed: October 30, 2013

Before: COLE and DONALD, Circuit Judges; MARBLEY, District Judge.[*]

─────────────────

**COUNSEL**

**ARGUED:** Colter L. Paulson, SQUIRE SANDERS LLP, Cincinnati, Ohio, for Appellant. Laura Moody, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Colter L. Paulson, SQUIRE SANDERS LLP, Cincinnati, Ohio, for Appellant. Andrea M. Christensen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

─────────────────

**OPINION**

─────────────────

BERNICE B. DONALD, Circuit Judge. The only evidence connecting Jesse Peoples to the murder he now serves a life sentence for committing was the testimony of two men who, along with Peoples, occupied a stolen Jaguar where the murder weapon

─────────────────

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

was found. During trial, the prosecutor elicited from these two witnesses known false testimony. Although the entire defense theory was that the two witnesses conspired to point the finger at Peoples, trial counsel did not use the only hard evidence at his disposal to prove that the two witnesses not only lied, but told the same lie. And he failed to do so despite the fact that Peoples himself found the evidence and told him how to use it.

We conclude that trial counsel was constitutionally ineffective for failing to impeach the credibility of these two witnesses based on known false testimony, and that the state court's determination to the contrary was an objectively unreasonable application of clearly established Supreme Court precedent. Accordingly, we **PARTIALLY REVERSE** the decision below as to the ineffective assistance claim and **REMAND** the case to the district court with instructions to conditionally **GRANT** a writ of habeas corpus, giving the State of Michigan ninety days to retry Peoples or release him from custody.

## I. BACKGROUND

Shannon Clark, a drug dealer, was shot and killed outside of his Detroit home. According to Clark's girlfriend, the two had returned home at 11:00 p.m., and Clark immediately went out again, leaving her in the home filled with marijuana and cash. A couple of hours later, a neighbor went outside after hearing three or four gunshots and found Clark's body lying on Clark's neighbor's front lawn. Clark had been shot once in the chest and twice in the back of the head. Police found two nine millimeter shells near the body.

Three months later, police arrested three men—Jesse Peoples, Demetrious Powell, and Cornelious Harris—after the men led the police on a chase in a stolen Jaguar that ultimately ended in a car crash. According to a police report written by an officer who witnessed the crash, the driver of the Jaguar was Cornelious Harris. Harris, in fact, was the only one of the three who was indicted for and served time for the crimes of fleeing in the third degree, which requires "being the driver," and unlawfully driving

away in a motor vehicle. After the crash, police found a nine millimeter Sig Sauer pistol—the same gun used to kill Shannon Clark—on the driver's side floorboard of the Jaguar.

## A. Trial: Testimony Implicating Jesse Peoples and Jury Deliberations

Jesse Peoples alone was tried for Shannon Clark's murder. The only evidence connecting him to the crime was the murder weapon found in the stolen Jaguar and the testimony of the other two men who occupied the same car, Demetrious Powell and Cornelious Harris. Powell and Harris both testified to two key facts: 1) that Peoples was the driver of the stolen Jaguar and had thus been sitting closest to the murder weapon, which Peoples owned; and 2) that Peoples told them about how he killed Clark.

Both Powell and Harris testified in detail about the stolen Jaguar incident, revealing that the car was stolen, that Powell, Harris, and Peoples led the police on a chase, and that all three were arrested. In response to careful questioning by the prosecutor, both witnesses testified that Peoples was the driver of the Jaguar during the chase and that Harris sat in the back seat. Powell went on to say that Peoples told him not to admit to owning any guns in the car (there were two others) because Peoples had used one of them to kill Clark. Testimony regarding the seating positions of the Jaguar occupants was important for two reasons. First, the prosecutor relied on it in her theory that Peoples, as the driver of the Jaguar, sat closest to the gun found on the driver's side floorboard. During closing arguments, for example, she said, "[W]e have both witnesses indicating Mr. Peoples is driving a [J]ag. . . . Where is the murder weapon found . . . It's found on the driver's side floorboard. . . . right beneath where Mr. Peoples's would have been in the Jag. The car crashes, he dumps the gun, and he's out." Second, it was known false testimony from the only witnesses implicating Peoples.

Before trial, Peoples mailed defense counsel a copy of the police report, indictment, and criminal docket sheet showing that Harris was the driver of the Jaguar. And yet defense counsel made no attempt to impeach Powell or Harris as to this fact. On cross-examination, defense counsel questioned both witnesses about the stolen car incident, asking questions about charges for assault, home invasion, and gun counts. But

he did not take the extra step of asking about Harris's charges as the driver of the Jaguar. Nor did he call to the stand the officer who wrote the police report naming Harris as the driver of the Jaguar or question Officer Lazar, a witness for the government who also observed the car crash scene, as to whether Harris was in fact the driver of the Jaguar.

The rest of the relevant testimony from Powell and Harris, in sum, is that Peoples told them how he had killed Clark. Both recounted similar stories. Powell testified that he and Peoples had planned to rob Clark but had never gone through with it. On the night Clark was shot, Peoples allegedly called Powell and said that he and a man called "O" "blew it" and had to "do the guy." In subsequent phone calls, Peoples allegedly told Powell that he and O had watched Clark leave his girlfriend at the house, and then the two had lain in wait for Clark to return. When he did, the two attacked Clark to rob him, but Clark ran and threw his keys. O caught Clark in the neighbor's back yard, Clark tried to punch O, and O shot Clark in the chest. Clark ran to the front yard and collapsed; Peoples followed and shot him twice in the head.

Harris's version differs only in minor details. According to him, around the time of the stolen Jaguar incident, Peoples told Harris how he and O had waited for Clark to return home on the night of the shooting. When he did, the two would-be robbers rushed at him, but Clark ran away. Peoples and O caught Clark, Clark tried to attack O, and Peoples "ran up and [shot] him." Then Clark ran, but Peoples "caught him again, and said he shot him." Peoples allegedly returned to the scene the next day to look for the keys Clark had thrown, but the house was full of family, and Peoples figured anything worth stealing had been removed.

Both witnesses testified that they admitted to their knowledge of the Clark murder because they did not want to be implicated themselves. They also testified that they received no benefit for their testimony other than civil immunity for the Clark murder, but this may not have been entirely true because at their own sentencing hearings for charges arising out of the stolen Jaguar incident, the courts expressly gave lower sentences in light of cooperation with the government. During closing arguments, the prosecutor said that Powell and Harris had received nothing in exchange for their

testimony, but the judge issued a jury instruction reminding the jury that the two men had received civil immunity.

Other than some testimony from officers and lab technicians about the gun found in the stolen Jaguar and the manner of Clark's death, that was virtually the entire case against Peoples. The prosecutor argued that Peoples killed Clark and that the killing was premeditated because Peoples had lain in wait outside Clark's home, chased him and shot him.

The defense theory was that Powell and Harris had "cooked up" their story implicating Peoples to remove suspicion from themselves while the two shared a prison cell following the stolen Jaguar incident. Defense counsel asked Harris and Powell on cross-examination whether they discussed their testimony while they shared a cell, and both men said "No." Counsel presented no witnesses and had no hard evidence of false testimony other than that already described.

While the jury deliberated, it requested a trial transcript. The judge responded, outside the presence of Peoples or his counsel, that the transcript was unavailable. After some time, the jury announced that it was deadlocked, but the judge instructed the jury to continue. Two hours later, the jury found Peoples guilty of premeditated murder, felony murder, being a felon in possession of a firearm, and felony firearm possession. The court sentenced Peoples to two concurrent life sentences for the murder convictions and shorter sentences for the other convictions.

**B. Appeals and Collateral Review**

Peoples appealed to the Michigan Court of Appeals with limited success. The court agreed with him that the dual convictions of premeditated murder and felony murder violated the Double Jeopardy Clause and remanded for entry of a single conviction. But the court rejected the claim that trial counsel was ineffective for failing to impeach the testimony that Peoples had driven the stolen Jaguar, concluding that the car chase was immaterial to the charged crime and that the seating location of the occupants did not necessarily indicate who owned the gun. The court also rejected the

claim that Peoples was denied due process when the trial court issued the ex parte jury instruction, concluding that advising the jury that a transcript is unavailable is an administrative communication, not a critical stage of the trial.

Peoples then applied for leave to appeal to the Michigan Supreme Court, re-raising his denied claims and adding two additional claims—that his due process rights were violated by prosecutorial misconduct when the government elicited known false testimony and that the evidence presented was insufficient to prove premeditated murder. The Michigan Supreme Court denied Peoples's application, stating that it was "not persuaded" to consider the questions presented.

Federal habeas relief was the obvious next step. Peoples first filed his 28 U.S.C. § 2254 petition in May 2006, raising the same claims: ineffective assistance of counsel, prosecutorial misconduct, insufficiency of the evidence, improper ex parte jury instruction, and one claim not at issue here. The district court dismissed the claims for prosecutorial misconduct and insufficiency of the evidence as unexhausted in state court, stayed the remaining claims, and administratively closed the case.

In order to save the unexhausted claims, Peoples returned to the Michigan trial court through the state collateral review process and requested an evidentiary hearing. The trial court denied the request, citing various provisions of Michigan Court Rule ("M.C.R.") 6.508(D), concluding that "defendant's allegations have been previously adjudicated and rejected in defendant's appeal as of right" and that Peoples had not been prejudiced. The Michigan Court of Appeals and the Michigan Supreme Court also denied the claims in substantively identical brief orders, stating that Peoples had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

Peoples then returned to federal court. The district court reopened the case, this time considering all of Peoples's claims on the merits. The court held that the claims were all exhausted and considered additional evidence it elicited from the parties but ultimately denied all claims on the merits. The court issued a certificate of appealability ("COA") on two of Peoples's claims: 1) prosecutorial misconduct; and 2) improper ex

parte jury communication. We expanded the COA to include all of the grounds for relief stated in Peoples's habeas corpus petition.

Peoples now appeals the denial of all four of his claims for habeas relief. The State responds that Peoples permanently lost his claims for prosecutorial misconduct and insufficiency of the evidence because he procedurally defaulted them, and that the other claims fail on the merits.

## II. STANDARD OF REVIEW

In a habeas corpus proceeding, this Court reviews a district court's legal conclusions de novo. *Hodge v. Hurley*, 426 F.3d 368, 375 (6th Cir. 2005). When reviewing this petition, we are bound by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 or "AEDPA." Pub. L. No. 104-132, 110 Stat. 1214. Under "AEDPA deference," we may only grant a writ of habeas corpus to state prisoners seeking § 2254 relief if the state court decision denying the claim on the merits was: 1) "contrary to" or an "unreasonable application of" clearly established federal law; or 2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 390 (2000).

Peoples argues that the Michigan courts unreasonably applied clearly established federal law when they denied his four claims. A decision involves an unreasonable application of clearly established federal law if the "state court identifies the correct governing rule . . . but unreasonably applies it to the facts" or if the application is otherwise "objectively unreasonable." *Williams*, 529 U.S. at 407, 409. As for the exact meaning of "unreasonable" in this context, the Supreme Court has been less than clear. In *Williams*, the Court warned against defining the term by reference to a "reasonable jurist" and held that the question is merely whether the decision was objectively reasonable. *Id.* at 409-10. More recently, however, the Court re-embraced reference to the jurist: "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 786 (2011). What is clear

is that a merely incorrect state court decision does not warrant federal habeas relief; the decision must be objectively unreasonable.  *Id*. at 785.

### III. PROCEDURAL DEFAULT

Before moving to the merits, we must address the State's argument that two of Peoples's claims—prosecutorial misconduct and insufficiency of the evidence—have been procedurally defaulted, and, thus, that this court may not reach the merits of those claims.  The State's position is incorrect.

When a state prisoner "procedurally defaults" a claim for habeas relief, meaning the prisoner lost the claim in state court by failing to raise it at the correct time, we defer to the state's procedural ruling and refuse to consider the claim on the merits.  *Wainwight v. Sykes*, 433 U.S. 72, 86-87 (1977).  Procedural default doctrine preserves the integrity of the statutory exhaustion requirement by preventing petitioners from letting the clock run on a claim in state court and then bringing the claim in federal court.  *O'Sullivan v. Boerkel*, 526 U.S. 838, 848 (1999).  A claim is procedurally defaulted where:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; *and* (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010)) (emphasis added).  The State contends only that the claims are procedurally defaulted because Peoples failed to comply with a Michigan procedural rule that required him to raise his claims at the correct time, but appears to concede that the state courts did not enforce the rule, arguing that the Michigan trial court "proceeded to briefly address the merits" of both claims.  Whether or not the first prong has been met, the second and third prongs have not.

The third prong of the procedural default test requires us to look into the state grounds for denying relief, as expressly stated by the state court.  *Id*.  Here, the most

recent state grounds for denying relief come from the Michigan Supreme Court, which issued a form rejection stating that Peoples had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." We have held, sitting en banc in *Guilmette*, that these kinds of form orders citing M.C.R. 6.508(D) are ambiguous as to whether they refer to procedural default or to denial of relief on the merits because the provision encompasses both options. *Id.* at 289-92. In such cases, then, we must look to the last *reasoned* state court opinion to determine the basis for rejection. *Id.* at 291.

The last reasoned state court decision in the present case came from the Michigan trial court when it denied collateral review on the prosecutorial misconduct and insufficiency of the evidence claims. The two-page order is admittedly confusing. It begins by stating the general Michigan rules that defendants must establish entitlement under both M.C.R. 6.508(D)(3) and M.C.R. 6.508(D)(2) before the court will grant an evidentiary hearing on collateral review. Rule 6.508(D)(3) is the state procedural default rule requiring petitioners to show cause and prejudice before raising a claim that could have been raised on direct appeal. Rule 6.508(D)(2) is a "relitigation" rule under which the state court will not grant relief if the petitioner alleges claims that were decided against the petitioner on a prior appeal. The order then proceeds down the second route and denies the two claims raised under Rule 6.508(D)(2):

> [D]efendant's allegations have been previously adjudicated and rejected in defendant's appeal as of right to the Michigan Court of Appeal which affirmed defendant's conviction and sentence. The law is quite clear that an appellate court's decision regarding a particular issue is binding on courts of equal or subordinate jurisdiction during subsequent proceedings in the same case. *People v. Peters*, 517 N.W.2d 775 (1994). The aforementioned issues raised by defendant in a prior proceeding precludes this Court's review pursuant to *Peters*, *supra* and MCR 6.508(D)(2).

In a somewhat inexplicable final paragraph, the order states: "Defendant was afforded a fair trial and full appeal. Therefore pursuant to MCR 6.508(D)(3)(b), defendant has failed to establish good cause and actual prejudice to support his claim." Rule 6.508(D)(3)(b), of course, is the procedural default rule, and the citation of it does not make much sense given the previous analysis. The trial court could not have

simultaneously concluded both that Peoples's claims had already been litigated on direct appeal *and* that Peoples lost his claims by failing to raise it on direct appeal. Most likely, the invocation of the procedural default rule in the last paragraph was a typographical error, and the court dismissed the claim under M.C.R. 6.508(D)(2). At most, the order is ambiguous, and, as we know from *Guilmette*, ambiguous orders do not provide adequate and independent state grounds. 624 F.3d at 289-92.

Prior to *Guilmette*, the State may have been able to convince us that these claims are procedurally defaulted. At that time, if a state court invoked M.C.R. 6.508(D)(2) but the petitioner had not actually raised the claim on direct appeal, we would infer that the state court had, *in actuality*, denied the appeal under M.C.R. 6.508(D)(3) as procedurally defaulted. *Hicks v. Straub*, 377 F.3d 538, 556-57 (6th Cir. 2004). Our holding in *Guilmette* overruled this practice, determining that we may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule. 624 F.3d at 291; *see also Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003) ("'[T]he mere existence of a basis for a state procedural bar does not deprive [federal courts] of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.'" (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985))).

Peoples may not have raised his claims at the proper time, but the state courts did not rely on the procedural default rule at all, much less unambiguously. Rather, they enforced a different rule, M.C.R. 6.508(D)(2). "When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." *Cone v. Bell*, 556 U.S. 449 (2009); *see also Hicks*, 377 F.3d at 557 (distinguishing between dismissal under M.C.R. 6.508(D)(2), which would not be indicative of procedural default, and dismissal under M.C.R. 6.508(D)(3), which does indicate procedural default). Peoples's claims of prosecutorial misconduct and insufficiency of the evidence have not been procedurally defaulted.

## IV.  CLAIMS FOR RELIEF

### A. Ineffective Assistance of Counsel

For Peoples to prove his ineffective assistance of counsel claim, he must show that 1) counsel's performance was constitutionally deficient and 2) the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also United States v. Washington*, 715 F.3d 975, 981 (6th Cir. 2013). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. We agree with Peoples that the failure of defense counsel to impeach known false testimony from the only two witnesses tying Peoples to the crime so undermined the adversarial process that the trial cannot be relied upon as having produced a just result. Peoples has met his burden to prove both deficient performance and prejudice, and the state court decision to the contrary was an unreasonable application of *Strickland*.

**1. Deficient Performance**

Deficient performance means that counsel committed "errors so serious" that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance." *Id.* at 687, 690. Although the *Strickland* deficiency standard presents a high bar for defendants, the prong is satisfied if representation "fell below an objective standard of reasonableness." *Id*. at 688; *see also Williams*, 529 U.S. at 390-91. We do not consider counsel's actions objectively reasonable when they could not possibly "be considered sound trial strategy." *Hodge*, 426 F.3d at 385.

Peoples claims that trial counsel was constitutionally ineffective for failing to impeach Harris and Powell by: 1) asking them on cross-examination about the charges against Harris as the driver of the stolen Jaguar, 2) seeking testimony from the officer who wrote a police report naming Harris as the driver of the stolen Jaguar, or 3) asking Office Lazar, a witness for the government who also observed the car crash scene, whether Harris was the driver of the Jaguar. In rejecting this claim, the Michigan Court of Appeals concluded only that counsel was not deficient for failing to seek testimony from the officer who wrote the police report because it could have been reasonable for

counsel to try to limit testimony regarding the car chase. The Michigan court also said, citing its own case of *People v. Hoyt*, 462 N.W.2d 793 (Mich. Ct. App. 1990), that counsel's performance could not have been deficient because Peoples was not deprived of a substantial defense.

The state court's reasoning ignores *Strickland's* rule that a court must consider whether counsel provided competent assistance "in light of all the circumstances." *Strickland*, 466 U.S. at 687, 690. Under the circumstances, failing to impeach the government's key witnesses in order to limit the testimony regarding the stolen car incident could not have been objectively reasonable strategy because Harris and Powell already had testified in detail about the incident. The jury already had heard about how the three men led the police on a chase in a stolen car, how all three of them were arrested, and about various convictions arising out of the incident. Defense counsel, in fact, elicited testimony about some of the charges, including those for assault, home invasion, and firearms offenses. Not seeking testimony from the officer, or even asking Harris and Powell additional questions about Harris's charges as the driver of the Jaguar, could not have been a protected strategic decision when there is no conceivable way that this decision could help the defense. Moreover, the state court's reasoning that Peoples was not deprived of a substantial defense is simply incorrect. Peoples *was* deprived of a substantial defense because he had no other way to prove his theory that Harris and Powell conspired to implicate him. Not using this evidence clearly falls "below an objective standard of reasonableness." *See id.* at 688.

We cannot over-emphasize the importance of impeachment in a case like this one. The government's case against Peoples hinged on the credibility of Harris and Powell because they were the only witnesses to tie Peoples to the crime. Of the three categories of information they testified to—that Peoples told them he killed the victim, that Peoples owned the gun, and that Peoples was seated closest to the gun because he was the driver of the Jaguar—only the last was known to be false. Impeachment on this fact would have done more than undermine the theory that Peoples sat closest to the gun. It would have shown that Harris and Powell told at least one lie—*the same lie*. All

counsel had to do was ask one more question on cross-examination to completely undermine the credibility of these witnesses. Failure to impeach the credibility of key witnesses with known false testimony is an egregious error in a criminal case. *Cf. Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002) (considering whether the evidence that counsel did not pursue would have been consistent with the defense theory to determine whether performance was deficient).

Moreover, impeachment would not have been a new and novel theory at trial. Trial counsel's entire defense strategy was to cast doubt on the credibility of Harris and Powell by suggesting that they cooked up their stories while sharing a jail cell. *See Foster v. Wolfenbarger*, 687 F.3d 702, 708 (6th Cir. 2012) (finding deficient performance where counsel failed to investigate an alibi defense that would have been "completely consistent with, and in fact complimentary to, trial counsel's theory"). Impeachment on the issue of who drove the Jaguar would have been entirely consistent with and a significant boost to this theory.

We have said that "[i]t is particularly unreasonable to fail to track down readily available and likely useful evidence that a client himself asks his counsel to obtain." *Couch v. Booker*, 632 F.3d 241, 247 (6th Cir. 2011). Where, as here, counsel fails to use a police report, indictments, and criminal docket sheets the client himself obtained that would have proven counsel's own defense theory, the failure is, *a fortiori*, unreasonable to the point of constitutional deficiency. It certainly is not, by any objective measure, sound trial strategy.

Trial counsel's failure to use readily available evidence to impeach the credibility of the only witnesses tying Peoples to the crime was well outside the range of professionally competent assistance, and it so undermined the trial that it cannot be relied on as having produced a just result. The state court's conclusion to the contrary is based on an incomplete view of the trial, the information counsel had available to him, and the strength of the government's case. The state court's decision on this point was objectively unreasonable. *See Williams*, 529 U.S. at 407, 409.

**2. Prejudice to Peoples**

Prejudice in this context means that there is a reasonable probability that the result would have been different but for counsel's errors. *Strickland*, 466 U.S. at 687, 694. To prove prejudice, Peoples "'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.'" *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694). "[T]he 'prejudice' prong is satisfied if 'there is a reasonable probability that at least one juror would have struck a different balance.'" *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 523-28 (2003)).

Peoples argues that he was prejudiced because without counsel's failures—i.e., if counsel had impeached false testimony linking Peoples to the murder weapon—the once-deadlocked jury would not have returned a guilty verdict. As to this question, the Michigan Court of Appeals said only that the question of who drove the Jaguar was "inconsequential." According to the court, the stolen Jaguar incident was unrelated to the charged crime because both Peoples and Harris were in the car and because Powell testified that the crash altered the location of the guns. This conclusion is unreasonable in light of the events at trial, the weaknesses of the government's case, and the fact that the jury announced that it was "deadlocked" before reaching a verdict.

While the Michigan Court of Appeals was correct that the government could have proven that Peoples owned the gun even without the known false testimony as to Peoples's location in the car, it ignored the extent to which the government relied on the testimony that Peoples was the driver of the Jaguar. The prosecutor repeatedly asked the witnesses whether Peoples was the driver of the Jaguar and then relied heavily on this testimony in her closing remarks. "[W]e have both witnesses indicating Mr. Peoples is driving a [J]ag. . . . Where is the murder weapon found . . . It's found on the driver's side floorboard. . . . right beneath where Mr. Peoples's would have been in the Jag. The car crashes, he dumps the gun, and he's out." The testimony as to the location of the occupants in the stolen Jaguar not only tied up her theory that Peoples was the owner of the gun, but it also made the other testimony, that Peoples owned the gun and that he told the others about how he killed the victim, more believable.

Impeachment would have undermined the totality of Harris and Powell's testimony. It also would have provided solid evidence that Harris and Powell had coordinated their stories, because both of them gave the same false testimony. We can think of no better way to attack the credibility of these witnesses than by proving that they testified to the same lie. Without credible testimony from these men, the only thing connecting Peoples to the crime would have been the circumstantial evidence of the murder weapon found in a car with him and two other men. Impeachment certainly could have led to exoneration.

Moreover, the case against Peoples depended almost entirely on the credibility of Harris and Powell. There was no other evidence tying him to the crime except the weapon found in the Jaguar with all three men. If Harris was driving the Jaguar, he, not Peoples, was closest to the weapon. Powell had already admitted that he had intended to rob Clark. This is certainly sufficient to create reasonable doubt as to Peoples's guilt.

Significantly, by announcing that they were deadlocked two hours before reaching a verdict, the jury signaled that it was not persuaded that Harris and Powell were credible. Defense counsel called no witnesses and had no theory other than accusing these two witnesses of conspiring to convict Peoples, so credibility was the paramount concern. If counsel had done as Peoples asked and impeached the testimony that Peoples was the driver of the Jaguar, "'there is a reasonable probability that at least one juror would have struck a different balance.'" *Lundgren*, 440 F.3d at 770 (quoting *Wiggins*, 539 U.S. at 523-28). Where the jury is already on the fence and the case against the defendant depends on the credibility of a witness, it is objectively unreasonable to conclude that failing to impeach the witness, with known false testimony, does not prejudice the defendant. *See Hodgson v. Warren*, 622 F.3d 591, 600-01 (6th Cir. 2010) (holding that defendant was prejudiced where an exculpatory witnesses, if believed, would have impeached the government's key witnesses). In fact, "[t]he likelihood of a different result [is] substantial." *Couch*, 632 F.3d at 247 (internal quotation marks omitted).

We conclude that Peoples met his burden to prove ineffective assistance of counsel and that the state court decision to the contrary was objectively unreasonable. A writ of habeas corpus is appropriate on this claim.

**B. Prosecutorial Misconduct**

We next turn to Peoples's claim of prosecutorial misconduct. "The Supreme Court has long recognized that due process is denied where '[the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.'" *Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Deliberate deception is "incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972). Relying on two predominant Supreme Court cases on prosecutorial misconduct—*Giglio* and *Napue v. Illinois*, 360 U.S. 264, 269-72 (1976)—we have fashioned a three-part test for determining whether there was a denial of due process through the use of false testimony:

> In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*Brooks*, 626 F.3d at 894-95 (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)). Testimony is material only if there is a reasonable likelihood that it affected the judgment of the jury. *Id*. at 895.

Peoples claims that he was denied due process by way of prosecutorial misconduct when the prosecutor repeatedly elicited known false testimony that he, not Harris, was the driver of the stolen Jaguar and that Harris and Powell received nothing in exchange for their testimony. According to Peoples, we can infer that the prosecutor knew that Harris was actually the driver of the stolen Jaguar from her detailed knowledge of the various charges arising out of the incident. Peoples also argues that

the prosecutor knew that Harris and Powell received lower sentences for their testimony. Peoples admits that he has not met his burden to prove that the testimony that Harris and Powell received nothing for their testimony was false, but he argues that the failure is only because the State did not produce the plea or sentencing transcripts when the district court requested them. This, he argues, can be remedied if we remand to give him the opportunity to locate the plea agreements and sentencing transcripts for these two men. As for materiality, Peoples argues that there is a reasonable likelihood that both pieces of false testimony affected the judgment of the jury because the case against him was weak and because the credibility of Harris and Powell was essential to the government's case.

We are rather disturbed by the prosecutor's use of false testimony that Peoples was the driver of the stolen Jaguar. The State does not deny that the testimony was false or that the prosecutor knew this testimony to be false other than to say that her knowledge is not clear from the record. But the trial transcript does show that the prosecutor was intimately familiar with the various charges arising out of the stolen Jaguar incident, and we may infer that she knew about the charges against Harris as the driver of the Jaguar. We are also disturbed by the State's failure to produce the plea or sentencing transcripts requested by the district court though it now argues, before this court, that Peoples cannot prove his claim because the transcripts are unavailable.

Nevertheless, there is still the matter of AEDPA deference. Although the state courts have not provided much reasoning to review—we have only the Michigan Supreme Court decision denying Peoples's application on grounds that it was "not persuaded" that it should consider the questions presented and the Michigan trial court's collateral review order dismissing the claims as "previously adjudicated"[1]—the Supreme Court has made clear that AEDPA deference applies even where the state courts have provided no reasoning. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1402 (2011). In such cases, we must determine what arguments *could have* supported the state court decision

---

[1] The State says that the trial court "briefly" discussed the merits of this claim, but we see no discussion of the merits in the Michigan trial court's order.

and then determine whether reasonable jurists could disagree. *Pinholster*, 131 S.Ct. at 1402. This is a "modified form of AEDPA deference," in which the court focuses on the result rather than the reasoning of the state court. *Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008).

Using modified AEDPA deference, we cannot say that it would have been objectively unreasonable for the state court to determine that the false testimony regarding Peoples's position in the stolen Jaguar was immaterial. Unlike our prejudice analysis on the ineffective assistance claim, where we asked whether the outcome would have been different had trial counsel impeached the false testimony, the question here is whether there is a reasonable likelihood that the outcome would have been different if the known false testimony had never been presented. While Peoples is correct that the location of the murder weapon in relation to himself connected him to the murder, it was not the only thing connecting him to the murder. The witnesses also testified that Peoples told them of how he killed the victim. It would not be objectively unreasonable for the Michigan courts to conclude that there is no reasonable likelihood that the outcome would have been different without testimony regarding Peoples's location in the Jaguar.

Even under modified AEDPA deference, however, it would be objectively unreasonable for the state court to conclude that any false testimony that Harris and Powell received nothing for their testimony did not likely affect the judgment of the jury. As Harris and Powell were the only witnesses tying Peoples to the crime, and as the credibility of both was fairly open to attack, any testimony bolstering their credibility likely affected the outcome of the jury. This is even more true in a case like this one, where the jury announced that it was deadlocked before reaching a verdict. Nevertheless, as Peoples admits, we have insufficient facts to discern whether the testimony was false and whether the prosecutor knew it to be false. While this would ordinarily warrant remand, such remand is unnecessary here because of our disposition on the ineffective assistance of counsel claim.

**C. Sufficiency of the Evidence**

Third, we address Peoples's claim that the State presented insufficient evidence to prove premeditation. We review insufficiency of the evidence claims under § 2254 solely to determine whether "there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 312-13, 315, 320-21 (1979). We may grant the writ if, viewing the evidence in the light most favorable to the prosecution, we conclude that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" on every element of the crime. *Id.* at 319, 324. The question is determined by looking to the applicable state law. *Id.*

In Michigan, first degree premeditated murder requires proof that the defendant intentionally killed the victim and that the act was premeditated and deliberate. *People v. Kelly*, 588 N.W.2d 480, 488 (Mich. 1998); *see also* Mich. Comp. Laws § 750.316(1)(a). This requires "sufficient time to allow the defendant to take a second look." *Kelly*, 588 N.W.2d at 488. Because the Michigan courts did not address this claim on the merits, we again use the modified form of AEDPA deference. *Hawkins*, 547 F.3d at 546.

Peoples argues that the testimony that he "lay in waiting" for Clark cannot be sufficient evidence to prove premeditation because the testimony is that he planned only to rob him. We agree, but this is not the only testimony from which a rational jury could infer premeditation. Both witnesses testified that the first shot was fired while Clark fought his attackers, and that two shots were fired after Clark ran away. A rational jury could infer that Peoples formed the requisite intent as Clark ran away.

Peoples argues that there was not sufficient time for premeditation between shots, nor did the prosecutor present evidence of any length of time between the shots. This argument ignores Michigan law. While Michigan courts have not stated precisely how much time is "sufficient," it is clear that the amount of time may be very short and that it may be inferred from the surrounding circumstances. For example, in *Kelly*, the Michigan Court of Appeals held that where the victim was stabbed, suffered blunt force trauma to the head, and strangled, the defendant had enough opportunity to reflect upon

his actions in between each method of assault.  588 N.W.2d at 488.  In *People v. Johnson*, the Michigan Supreme Court held that evidence of manual strangulation can be used, in combination with evidence of defensive wounds, to show premeditation. 597 N.W.2d 73, 79 (Mich. 1999).  Most on point is the case of *People v. Waters*, in which the Michigan Court of Appeals found sufficient evidence of premeditation where the defendant held the gun with both hands and where testimony suggested a time-lapse of between two and four seconds between shots.  324 N.W.2d 564, 567 (Mich. Ct. App. 1982).  While "some interval" is necessary, it appears that even an interval as short as "one second" will do.  *See People v. Tilley*, 273 N.W.2d 471, 474 (Mich. 1979); *see also People v. Berthiaume*, 229 N.W.2d 497 (Mich. Ct. App. 1975) (noting that "mere[] seconds" may be sufficient time for a second look).  Here, viewing the evidence in the light most favorable to the prosecution, according to testimony from Harris and Powell, there was at least enough of an interval between the first and second shot for Clark to stand up and start running.

Peoples further contends that the evidence regarding the second shot cannot be sufficient for premeditation because there is nothing to show that his thought process was "undisturbed by hot blood."  *See People v. Morrin*, 187 N.W.2d 434, 449 (Mich. 1971).  This argument does not suffice under the modified AEDPA deference standard. It would not be objectively unreasonable for the state court to conclude that a reasonable trier of fact could infer sufficient time for a deliberate, premeditated, and "cool blood" thought process between the first and second shots.

We decline to grant a writ of habeas corpus as to the insufficiency of the evidence claim.

**D. Ex Parte Jury Instruction**

Finally, we move to Peoples's claims that he was denied the right to counsel because the trial court told the jury, outside of the presence of Peoples or his attorney, that a trial transcript was not available.  The Supreme Court has held that the right to counsel extends beyond the trial itself to all other stages in which "counsel's absence might derogate from the accused's right to a fair trial."  *Coleman v. Alabama*, 399 U.S.

1, 7 (1970) (internal quotation marks omitted).  A defendant has the right to counsel at any "critical" stage of the proceeding, meaning the defendant would be subject to "potential" prejudice without counsel.  *Id*. at 9.  We have held that when the trial court gives a "supplemental jury instruction," it  is indeed a critical stage of a criminal proceeding, especially when the trial court issues the instruction to a deadlocked jury. *French v. Jones*, 332 F.3d 430, 436, 438 (6th Cir. 2003) (affirming a grant of the writ where court issued an ex parte jury instruction to a deadlocked jury).  However, not every statement to the jury goes so far as to be a "critical stage" instruction.  For example, we declined to hold that a trial court's re-reading of the jury instructions that had already been read was a critical stage jury instruction.  *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003).

According to Peoples, he was subjected to potential prejudice without counsel because the jury likely wanted to take a closer look at the statements of Harris and Powell to consider their credibility.  If counsel had been present, he argues, counsel could have asked the court to advise the jury that a transcript could be made available at a later time.  Therefore, it was a critical stage in the proceedings and the right to counsel attached.   The Michigan Court of Appeals held that the trial court's communication was "administrative," resulted in no reasonable probability of prejudice, and, therefore, it was not a "critical" stage in the proceedings. It then concluded that the error was harmless and denied the claim.

Under AEDPA deference, we must reject Peoples's claim because it was not objectively unreasonable for the state court to conclude that communication regarding the transcript was "administrative" and outside of the class of "critical stage" jury instructions that subjects a defendant to prejudice if made without counsel.  *See Coleman*, 399 U.S. at 9.  The jury already had heard all testimony from the trial, so a transcript could only have provided this information a second time.  Giving a jury information it already has heard is not necessarily a critical stage.  *Hudson*, 351 F.3d at 216.  It was not objectively unreasonable to include the present facts in that category.  Moreover, although we have said that it is objectively unreasonable to apply harmless

error analysis to situations in which critical stage jury instructions are made outside of the presence of counsel, this does not apply to situations where the statement is not a critical stage instruction. *See French*, 332 F.3d at 438

Accordingly, we decline to grant a writ of habeas corpus as to the ex parte jury instruction claim.

## V. CONCLUSION

For the reasons explained above, we **PARTIALLY REVERSE** the decision below as to the ineffective assistance claim and **REMAND** the case to the district court with instructions to conditionally **GRANT** a writ of habeas corpus, giving the State of Michigan ninety days to retry Peoples or release him from custody. While the prosecutorial misconduct claim may warrant further inquiry as to the facts, this claim is rendered **MOOT** by our remand as to the ineffective assistance of counsel claim. We **AFFIRM** the decision of the district court as to the insufficiency of the evidence and the ex parte jury instruction claims.