IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 16, 2018 Session

**JAMES ALLEN POLLARD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County
No. 2006-D-2820     Monte Watkins, Judge**

_____

**No. M2017-01595-CCA-R3-PC**

_____

The Petitioner, James Allen Pollard, appeals the post-conviction court's dismissal of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel. After thorough review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard Lewis Tennent and Jodie A. Bell, Nashville, Tennessee, for the appellant, James Allen Pollard.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Deborah M. Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On February 12, 2009, the Petitioner was convicted of first-degree felony murder, first-degree premeditated murder, and especially aggravated robbery. The first-degree felony murder and first-degree premeditated convictions were later merged, and the Petitioner was sentenced to life imprisonment plus eighteen years. State v. James Allen Pollard, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253, at *1 (Tenn. Crim. App. Sept. 17, 2012), aff'd, 432 S.W.3d 851 (Tenn. 2013). This court affirmed his convictions and sentence lengths, but remanded the case for a new sentencing hearing to determine

whether his sentences should be served consecutively. Id. at *21. Our supreme court affirmed this court's ruling, and on remand, the trial court determined that the Petitioner's sentences should be served concurrently. This court cited the facts underlying the Petitioner's case as follows on direct appeal:

*Suppression hearing*

Detective Jeff Wiser, of the Metropolitan Nashville Police Department, testified that he responded to the victim's apartment, where the victim had been found dead from gunshot wounds. In working with Detective Michael Windsor, also of the Metro Nashville Police Department, to develop a suspect for the shooting, Detective Wiser subpoenaed the victim's phone records, which showed calls to Lakesha Hooten around the time of the victim's death. The detectives interviewed Ms. Hooten. Ms. Hooten initially denied any knowledge of the murder and robbery but later gave detectives the names of two men she claimed were the shooters. The detectives learned that information was false, and Ms. Hooten "finally broke down and told [them] that it was her boyfriend [the Petitioner] who had committed the murder." [The Petitioner] voluntarily agreed to speak to detectives. Detective Wiser read [the Petitioner] his Miranda rights, and [the Petitioner] signed a waiver of his rights. [The Petitioner] then admitted to shooting the victim and taking a PlayStation video game system from the victim's apartment. Detectives subsequently arrested [the Petitioner].

*Trial*

The victim's mother, Marilyn Branhan, testified that she last saw her son on March 22, 2006, when he visited her home on his lunch break from work. He had plans to come back to her house that night to sign documents for his upcoming house purchase, but he did not show up. Ms. Branham was unable to contact the victim the following day. On March 24, 2006, she drove to the victim's apartment and waited beside his car until it was time for the victim to leave for work, but the victim never came out of his apartment. Ms. Branham then asked the apartment manager to go inside to check on him, while Ms. Branham drove to her home and called the police. Shortly thereafter, the apartment manager called Ms. Branham and asked her to return to the apartment and told her that she had found the victim.

Officer Michael Clark was the first officer to respond to the shooting at the victim's residence on March 24, 2006. Officer Clark discovered the

victim's body lying in the floor of the living room inside the victim's apartment. The victim had been shot. Officer Clark testified that it did not appear that the victim's apartment had been forcibly entered. He noticed electronic equipment that appeared to have been pulled out away from the TV stand, but there were no other signs of a struggle.

Detective Wiser also responded to the victim's residence on North 8th Street. He testified that the victim was lying on his back in the living room, and he had two gunshot wounds to his head. The victim's apartment did not appear to be ransacked, but Detective Wiser noticed that it appeared as if something had been removed from the TV stand.

Several months into the investigation, the detectives developed [the Petitioner] as a suspect in the shooting. Detective Wiser interviewed [the Petitioner] about the incident. Initially, [the Petitioner] "vehemently denied taking anything" from the victim's apartment. [The Petitioner] later admitted that he took a gun and a PlayStation.

Officer William Kirby testified that he was called to the crime scene in order to assist with searching for and processing evidence. Officer Kirby testified that he had worked for the Metropolitan Police Department for approximately 13 years and that he had processed "at least" one thousand crime scenes. Officer Kirby took several photographs of the crime scene. He testified that there was blood "directly behind the victim's head against the wall and pooled beneath [the victim's] right cheek." He testified that there was no blood on the front of the victim's shirt. There were two pools of blood on the carpet beside the victim's head, and there was no other blood found anywhere else in the apartment. Officer Kirby observed "a bit of blood spatter" on the wall that was eight to ten inches away from the victim's head. Officer Kirby testified that small blood droplets, indicative of high velocity impact, were up the wall as high as six to eight inches above the carpet. Without objection by [the Petitioner], Officer Kirby testified that, based on the direction and location of the blood spatter, his opinion was that the victim was lying on the ground at the time he was shot.

Officer Kirby testified that there was a note found on the victim's car, which was parked on the street in front of the victim's apartment. The note read, "Urgent, call me as soon as you get this message, Momma." He testified that, other than an overturned beer bottle and electronics pulled off of the TV stand, nothing in the victim's apartment appeared to be askew. Officer Kirby testified that the murder did not appear to be drug-related

because he did not find anything in the victim's apartment that was indicative of the victim having sold drugs.

Reshena Barnes was dating the victim at the time of his death. She met the victim while they were students at Tennessee State University. She lived with the victim from February 17, 2006, to March 17, 2006. She moved out in order to avoid any confrontation between her ex-boyfriend, Joseph Stewart, and the victim. She had an order of protection granted against Mr. Stewart because he had previously threatened her. Ms. Barnes testified that the victim worked at Autozone and that he was excited about buying his first house. Ms. Barnes testified that she never knew the victim to sell marijuana. The victim owned a gun that he kept in his bedroom closet.

Detective Windsor testified that the door to the victim's apartment was locked, and there was no sign of forced entry. Detective Windsor obtained the victim's phone records and determined that Lakesha Hooten had been one of the last people to call the victim prior to his death. Detective Windsor interviewed Ms. Hooten. Detective Windsor investigated the information provided by Ms. Hooten and concluded that "she was possibly being deceptive" because he was unable to verify that information. Detective Windsor testified that the gun owned by the victim was a 9 millimeter semi-automatic, which would have ejected a cartridge casing if it were fired, and investigators did not find any fired cartridge casings at the crime scene. Investigators also did not find any projectile strikes, or holes caused by the firing of a gun, inside the apartment. Investigators found an empty gun holster in the victim's bedroom.

Detective Windsor interviewed [the Petitioner] about the shooting. Detective Windsor testified that [the Petitioner] voluntarily met with him and that during the interview, [the Petitioner] signed a Miranda waiver form. Detective Windsor testified, over [the Petitioner]'s objection, that he did not believe [the Petitioner] killed the victim in self-defense because he "did not feel that the injuries sustained by the victim lined up with the Petitioner's] account of the shooting." Detective Windsor further explained that [the Petitioner] had stated that the victim, while lying on the floor, raised his arm and pointed a gun at [the Petitioner], and Detective Windsor did not believe that [the Petitioner] would have moved "closer to the victim, closer to being in danger" to shoot the victim a second time. [The Petitioner] also demonstrated to Detective Windsor the distance from which [the Petitioner] shot the victim the second time, but Detective Windsor

believed that the evidence showed that [the Petitioner] "was a lot closer [to the victim]."

Anthony Bowers, [the Petitioner]'s cell mate, testified that [the Petitioner] told him that [the Petitioner]'s girlfriend "Keisha" set the victim up to be robbed by [the Petitioner]. Mr. Bowers testified that [the Petitioner] told him that Keisha drove [the Petitioner] to the victim's house in order to "rob him for some marijuana," and that once inside the victim's apartment, the victim "looked like he was getting kind of suspicious" because he asked [the Petitioner] for money, but [the Petitioner] did not have money to purchase the marijuana. [The Petitioner] then pulled out a gun and he and the victim "started tussling, and in the middle of the tussle [the Petitioner] shot [the victim] in the head." [The Petitioner] told Mr. Bowers that he thought the victim was trying to get a gun. After he shot the victim, [the Petitioner] searched the victim's apartment for valuables and took a cell phone, a pistol, and some marijuana, and "before he left [the Petitioner] shot [the victim] again because [the Petitioner] said [the victim] was still—he was still alive and he didn't want him to be able to identify him." Mr. Bowers testified that [the Petitioner] told him that he shot the victim in the head twice. He testified that [the Petitioner] had stated that he shot the victim with a .38 caliber revolver and that [the Petitioner] "several times [ ] would always comment that that was the gun you use if you were going to murder someone ... [b]ecause it didn't leave any shells."

[The Petitioner] told Mr. Bowers that he had been arrested after detectives questioned [the Petitioner]'s girlfriend about phone calls she made. Mr. Bowers testified that [the Petitioner] told his girlfriend to tell detectives that someone else had taken her phone and that she had taken "some guys" over to the victim's house and they robbed him. Detectives tried to verify that information and discovered it to be false. Then detectives "broke [[the Petitioner]'s girlfriend] down and she wound up telling the truth, that [the Petitioner] was the one that had done it." [The Petitioner] did not tell Mr. Bowers that he took the victim's PlayStation.

Mr. Bowers testified that he was not offered anything by the prosecution in exchange for his testimony. About coming forward with this information, Mr. Bowers testified:

> [A]t first I had a hard time coming forward because me and [the Petitioner] we become [sic] friends, but I constantly reflect back on the time when I was out dealing drugs and

- 5 -

realized that the same thing could have easily happened to me. And if my family had to go through that, I would wish that someone would have the courage to step up and give any information that they have.

Mr. Bowers was incarcerated in federal prison having been convicted of "drug conspiracy." Mr. Bowers had previously been convicted for "drugs and reckless endangerment." On cross-examination, Mr. Bowers testified that he did not recall [the Petitioner] making any statements to him about the victim having a gun, but he "believe[d] they were wrestling." Mr. Bowers testified "[the Petitioner] was tussling with [the victim] and [the Petitioner] shot [the victim]."

Medical examiner Thomas Deering performed the victim's autopsy. Dr. Deering testified that the victim sustained two gunshot wounds to the head. The victim was shot in his chin, and Dr. Deering testified that the stippling pattern around that wound indicated that the shot was fired from between six inches to two feet away. Dr. Deering testified that the shot to the victim's chin caused significant bleeding and that the victim swallowed and aspirated "a moderate amount of blood" from that wound, indicating that the victim was still living after the shot. The victim was also shot in his left temple, which was the fatal shot, and the soot and stippling around that wound indicated that the shot was fired from within six inches of the victim's head. The bullet that entered the victim's temple traveled a straight path "for the most part" from the victim's left to right and fractured the victim's skull and brain. Dr. Deering recovered both bullet jackets and some bullet fragments. Dr. Deering testified that the toxicology report revealed that the victim's blood alcohol level was .04 percent and that he had a "very small amount" of Carboxy–THC, a byproduct of marijuana, in his system.

On behalf of [the Petitioner], Earl Campbell testified that he was a former Metro Nashville Council Member and worked at the Davidson County Clerk's Office. He knew [the Petitioner] "when he was a young boy" and [the Petitioner] had helped his father clean at the Madison Church of Christ. Mr. Campbell testified that [the Petitioner] was "a good kid" and that he worked hard. Mr. Campbell testified that "back then [the Petitioner] seemed to be very honest."

[The Petitioner]'s father, James Pollard, Sr., testified that [the Petitioner] had been working for him at his cleaning service company full-

time for four years. [The Petitioner] had lived with Mr. Pollard, and Mr. Pollard testified that [the Petitioner] had "a couple of PlayStations." On cross-examination, Mr. Pollard testified that he knew about [the Petitioner]'s charges, and [the Petitioner] "didn't show [him] no remorse about nothing." [The Petitioner]'s mother, Cherrion Pointer, testified that [the Petitioner] had lived with her until he was 18, 19, or 20 years old, when he began living with his father. She testified that [the Petitioner] was a reliable person and [the Petitioner] had just received a graduation certificate from Cornerstone Christian Academy.

*Sentencing hearing*

At the sentencing hearing, a presentence report was entered into evidence. The victim's mother, Marilyn Branham, and brother, James Branham, testified that the victim's murder had greatly affected their family and had caused a substantial amount of grief. [The Petitioner] did not testify or present any other proof at the sentencing hearing.

*Motion for new trial*

At the hearing on [the Petitioner]'s motion for new trial, the Assistant District Attorney General Deborah Housel, who prosecuted [the Petitioner]'s case, testified that on January 5, 2007, in response to a discovery request from [the Petitioner], she reported that there was no exculpatory evidence known to the prosecution at that time. In a letter dated January 29, 2009, General Housel notified defense counsel of four additional witnesses, including "Anthony Bowers (federal inmate)," which the State intended to call at trial. She also prepared and filed a writ of habeas corpus ad testificandum in order to have Mr. Bowers transported to [the Petitioner]'s trial scheduled for February 9, 2009, and she faxed a copy to defense counsel.

General Housel testified that she called defense counsel on February 2, 2009, and "had a long and lengthy discussion." She told defense counsel that Mr. Bowers' attorney had contacted her and told her that Mr. Bowers had "information regarding admissions that were made by [the Petitioner] to him." General Housel also told defense counsel that she had interviewed Mr. Bowers along with Detective Windsor, and that the State had initially elected not to use Mr. Bowers' testimony at [the Petitioner]'s trial because Mr. Bowers had been accused of raping another inmate. However, General Housel also told defense counsel on February 2, 2009, that Mr. Bowers had

- 7 -

since "been cleared of all wrongdoing concerning [the rape allegation]," and that the State intended to have Mr. Bowers brought to court, although she "had no clue whether or not he was going to testify for [the State] or not." General Housel testified, however, that in light of the strength of the State's case against [the Petitioner], she did not believe she needed to call Mr. Bowers as a witness. General Housel invited defense counsel to "feel free to come by, look at all the file, and the letter [written to General Housel by Mr. Bowers], and all the information regarding the rape." General Housel recalled that defense counsel "came over to [her] office one day and [she] gave him the box with all the information in it." She testified that she showed defense counsel the letter from Mr. Bowers.

General Housel testified that she met with defense counsel again on February 6, 2009, and she "brought the entire file for [defense counsel] to look through. [She] opened it, showed him everything" and gave defense counsel the opportunity to make copies of the file, which included the letter from Mr. Bowers and information regarding the rape allegation and investigation. General Housel testified she was "one hundred percent positive that [she] went into great detail with [defense counsel], all of the allegations that were made and the letter [Mr. Bowers] sent [her]."

General House[l] testified that she believed that Mr. Bowers "was going to get consideration for his testimony," but that she did not know what relief, if any, he received in federal court. She testified that she did not tell defense counsel that Mr. Bowers was eligible for a sentence reduction in exchange for his testimony "because [she didn't] know that that's true." She told defense counsel that all she could do for Mr. Bowers was "put in a good word" for him to Assistant United States Attorney Blanche Cook, who was assigned to Mr. Bowers' case. General Housel acknowledged that she sent an email to Ms. Cook following [the Petitioner]'s trial, advising Ms. Cook that Mr. Bowers "did a fabulous job" and General Housel wrote, "I know I can't help Mr. Bowers but if I could, I would certainly give him any consideration and break I could. He provided crucial testimony."

General Housel testified that she met with Mr. Bowers on November 30, 2007. Another Assistant District Attorney, Katie Miller, accompanied her to that meeting to discuss a case in which Mr. Bowers offered some information. Ms. Housel did not know of any other cases in which Mr. Bowers had provided assistance to the prosecution. Ms. Housel testified

that Mr. Bowers "was not a possible witness until [she] found out that he had been cleared of the rape allegation."

Attorney Jack Seaman testified that he represented Mr. Bowers in federal court at a hearing on a "Rule 35" motion to reduce Mr. Bowers' sentence in 2008, prior to Mr. Bowers having testified at [the Petitioner]'s trial. Mr. Seaman explained that a Rule 35 motion is filed by the government in order to seek a reduction in a defendant's sentence based on assistance he provided to the government. In Mr. Bowers' case, the motion was denied. Mr. Seaman testified that he represented to the federal court that Mr. Bowers "provided information and assistance regarding at least five people that got convicted" and in one case in which the [the Petitioner] pled guilty, and that Mr. Bowers "provided assistance in the prosecution of a couple of people but he [was] not called as a trial witness." At the time of Mr. Bowers' resentencing hearing, Mr. Seaman did not believe that Mr. Bowers would be called as a witness in [the Petitioner]'s case "because of accusations he was involved in a gang rape."

On cross-examination, Mr. Seaman testified that he contacted General Housel "[m]ultiple times" to offer Mr. Bowers' assistance in [the Petitioner]'s case, and Ms. Housel advised that the State was not interested in Mr. Bowers' testimony "because the case was so strong ." Mr. Seaman recalled a conversation with General Housel after Mr. Bowers was accused of rape in which General Housel advised Mr. Seaman that she was "absolutely" not going to call Mr. Bowers to testify. Mr. Seaman acknowledged that General Housel contacted him in January, 2009, to inquire about the rape allegation, and Mr. Seaman informed her that the rape allegation was false. General Housel then asked Mr. Seaman to find out whether Mr. Bowers would still testify, and Mr. Seaman was doubtful that Mr. Bowers would testify because he had already had his resentencing hearing. Mr. Seaman testified that Mr. Bowers did not benefit from his testimony in [the Petitioner]'s case. Mr. Seaman also testified that he did not inform General Housel about other cases in which Mr. Bowers provided assistance.

[The Petitioner's trial counsel] testified that he became aware of Anthony Bowers on January 30, 2009, when he received a fax from General Housel that listed four additional potential State's witnesses. [The Petitioner's trial counsel] testified that in a "subsequent conversation," General Housel disclosed that Mr. Bowers' testimony was regarding a "jailhouse confession" and that there had been "a rape case against Bowers

- 9 -

but he was exonerated on that." General Housel stated that she was unsure whether Mr. Bowers would be called to testify. [The Petitioner's trial counsel] testified that if he had more time, he "would have done everything [he] could to have tried to follow up on this." [The Petitioner's trial counsel] acknowledged that General Housel had "been very open and very forthcoming, as she always is in every case" and that she had offered for [the Petitioner's trial counsel] to copy her file which was "probably eight to nine inches thick." He testified that General Housel told him that her file was "basically the same as [his]," and [the Petitioner's trial counsel] did not look through the file, although he did not think that General Housel "would have objected had [he] gone through it line by line, sheet by sheet."

[The Petitioner's trial counsel] testified that he was not made aware of the letter from Mr. Bowers to General Housel; however, on cross-examination, he acknowledged that General Housel told him that she had received a letter from Mr. Bowers and that he remembered General Housel "paraphrasing the contents of the letter." [The Petitioner's trial counsel] testified, "General Housel and I had spoken pretty regularly about Bowers, and—even to the fact that she didn't know whether he would testify[.]" [The Petitioner's trial counsel] testified that he listened to the audiotape of General Housel's interview with Mr. Bowers on the morning before Mr. Bowers testified. [The Petitioner's trial counsel] was aware of the allegations against Mr. Bowers and that "he had been cleared." However, [the Petitioner's trial counsel] was "not aware, or made aware, of the factual basis" for the allegation, and had he known, he would have cross-examined Mr. Bowers about it. [The Petitioner's trial counsel] testified, "I would have used anything I could have to have shown any possible motive on his behalf other than the goodness of his heart."

[The Petitioner's trial counsel] was not aware that Mr. Bowers had provided assistance in any prosecutions other than the one in which Assistant District Attorney Katie Miller also met with Mr. Bowers with General Housel present. [The Petitioner's trial counsel] testified that he "distinctly remembered" General Housel telling him that "there was nothing that [she] could do to help [Mr. Bowers]." [The Petitioner's trial counsel] testified, "General, in my opinion you told me—you disclosed everything that you knew." [The Petitioner's trial counsel] testified that he believed that "the most damning testimony" was that of the medical examiner and the firearms expert. He testified, "I would say these two coupled together were the things that we just weren't able to overcome."

Id. at *1-7.

The Petitioner filed a timely petition for post-conviction relief on December 2, 2014, in which he argued, as in this appeal, that he received ineffective assistance of counsel because trial counsel failed to effectively challenge the testimony of Anthony Bowers, failed to sufficiently litigate his motion to suppress, and failed to object to the testimony of Officer Wayne Kirby as a "blood splatter" expert. The post-conviction court conducted evidentiary hearings on the Petitioner's issues on August 3, November 9, and December 15, 2015.

*August 3, 2015 Post-Conviction Hearing*

At the August 3, 2015 evidentiary hearing, the Petitioner's trial counsel testified that he had been an attorney for forty-five years and had handled over a hundred criminal trials, both in state and federal court. Trial counsel testified that he was familiar with the federal electronic case filing system and further conceded that he did not look through the State's discovery "page by page" because he and the State had "basically, the same file[.]" He affirmed that he did not see an email from an Assistant United States Attorney referencing Mr. Bowers' testifying and seeking a reduction in his prison sentence, and he further stated that he was not made aware that Mr. Bowers would be testifying until the night before trial. He also affirmed that he was unaware that Mr. Bowers had previously provided information to the government against other defendants and that he had assaulted a fellow inmate. Trial counsel testified that if he had known about the circumstances surrounding Mr. Bowers' testimony, he would have used it to cross-examine him. However, trial counsel also explained that although he did not know about the specific circumstances surrounding Mr. Bowers, during cross-examination he asked Mr. Bowers about his drug use and criminal history and during closing argument he portrayed Mr. Bowers as "a snitch and a liar" and told the jury not to be surprised if Mr. Bowers and his attorney later "ask[ed] for a modification of his sentence" based on his testifying. When asked whether he believed the evidence against the Petitioner was overwhelming, even without Mr. Bowers' testimony, trial counsel responded that he "would certainly agree that there was a factual basis for the jury to find what they found."

Trial counsel also testified regarding his actions during the suppression hearing. When asked why he did not call the Petitioner to testify regarding whether officers had illegally seized him, trial counsel stated that the Petitioner had declined to testify, even after trial counsel explained that the issue was "something [the Petitioner] was going to have to substantiate." Further, trial counsel stated that even if the Petitioner had testified at the suppression hearing, he did not believe the Petitioner would have testified that there was "any show of force by the police that compelled him to come to the police station" because he had never mentioned a show of force to trial counsel. Trial counsel

- 11 -

explained that he chose to rely on the videotape of the Petitioner's interview with police as substantive proof at the suppression hearing based on the Petitioner's unwillingness to testify. Trial counsel conceded that the Petitioner "changed his story" multiple times during his interview with police and even asserted that he had shot the victim twice in self-defense after the victim shot at him, though no other "bullet strikes or casings" were found at the victim's apartment. Trial counsel also conceded that "one of the big thing[s]" at the suppression hearing was that the Petitioner was both "allowed to leave during the interview to go down the hall" and to "leave after the interview."

Trial counsel was finally questioned about the "blood splatter" trial testimony of Officer Kirby. When asked why he did not object to Officer Kirby's testimony, trial counsel explained that:

> I felt the best choice was to draw as little attention as possible to that; and, just simply to not go into that. There is – in my opinion, most jurors feel that a person in the police department that has worked with these types of programs, and has processed many crime scenes, that these people know what they're talking about. . . . It was a matter of trying to lessen the impact.

Though trial counsel conceded that he had not read the specific cases mentioned by appellate counsel, he testified that he read "digests . . . on the issue of blood splatter" and "felt strategically it would be better not to [object]."

*November 9, 2015 Post-Conviction Hearing*

At the November 9, 2015 post-conviction hearing, attorney Kathleen Morris gave expert testimony, over the State's objection, regarding how "non-deficient" defense counsel should operate. Ms. Morris testified that a non-deficient attorney would look through discovery given by the State. She also stated that a non-deficient attorney would call his client to testify at a suppression hearing regarding whether his client was illegally seized by police. Ms. Morris testified that a non-deficient attorney would look through an inmate's file after being told he was going to testify against his client and stated that she was personally able to find Mr. Bowers' file and his previous efforts to obtain sentencing reductions. She finally testified that a non-deficient attorney would object to a police officer giving "blood splatter" testimony without first being qualified as a "blood splatter" expert and would move for a mistrial.

Mr. Bowers also testified at the November 9, 2015 hearing. He affirmed that he had previously received a reduction in his sentence length for his assistance in the State's prosecuting a drug dealer. He further affirmed that he had provided information against

multiple other cellmates and had sought a sentence reduction in those cases. He also offered to provide information for federal cases in Kentucky and Florida and for three cases in Nashville, including the Petitioner's. Mr. Bowers conceded that prior to the Petitioner's trial, a federal judge denied a motion to reduce his sentence because of his assault of a fellow inmate and found Mr. Bowers to be "not credible on th[o]se issues." He testified that although he had been questioned about his motives by trial counsel, if he had been specifically asked about his desire for a sentencing reduction, he would have conceded that it was his motive in testifying against the Petitioner. Mr. Bowers also stated that the only time he had testified regarding the information he tried to provide was at the Petitioner's trial, and he verified that he had not been promised any sentence reduction by the State or federal government and that his testimony "didn't help [him,]" but affirmed that it was truthful.

*December 15, 2015 Post-Conviction Hearing*

At the December 15, 2015 post-conviction hearing, Detective Wiser testified that Ms. Hooten implicated the Petitioner in the murder of the victim after falsely accusing two other men. Based on Ms. Hooten's previous incorrect statements, Detective Wiser testified that he did not get an arrest warrant for the Petitioner, but rather decided first to interview him. Detective Wiser testified that he and Detective Windsor located the Petitioner in the parking lot of Ms. Hooten's apartment. Although he did not remember whether he put his hand on his gun, he stated that he had a gun on his hip "[a]s [officers] always do[,]" but that he "typically d[idn't]" keep his hand on his gun. He testified that the Petitioner agreed to "voluntarily com[e] down to the police station for an interview" and that they transported the Petitioner to the police station after frisking him for weapons, as was "standard procedure." He further explained that although he could not remember exactly why they transported the Petitioner to the police station, it was "not uncommon" for them to give rides to people who needed to go to the police station, "like a courtesy." Detective Wiser further affirmed that his interaction with the Petitioner was not hostile, but was a "civil conversation . . . [t]here w[eren't] any direct commands, or nothing [] like that."

The Petitioner also testified at the December 15, 2015 hearing. He testified that Detective Wiser "reached for his gun" when he and Detective Windsor approached the Petitioner in the parking lot of Ms. Hooten's apartment. He stated that the detectives would not allow him to go back to his apartment to tell "the kids" he was leaving, called for a police car, and "never gave [him] [the] choice" to walk away from them. The Petitioner further testified that he "never left custody" of the detectives after getting in the police car, though he affirmed he was not handcuffed. He stated that he relayed this information to trial counsel, and he responded, "Not that I recall" when asked whether trial counsel talked to him about testifying at the suppression hearing. On cross-

- 13 -

examination, the Petitioner affirmed that trial counsel had "done his homework" and presented a recently-decided case at the suppression hearing that was similar to the Petitioner's. He further affirmed that trial counsel met with him "many, many times[,]" "showed [him] all the discovery in this case[,]" and "successfully was able to keep [the] pictures of [the] dead [victim] out[.]" He also testified that trial counsel "went over possible defenses" with him, and he chose not to testify at trial. The Petitioner also agreed that trial counsel had put on character witnesses on his behalf, made many objections, and "involved [him] in many discussions" regarding the trial.

At the close of the final evidentiary hearing, the post-conviction court entered a written order denying and dismissing the Petitioner's post-conviction petition, finding that he was not entitled to relief. The Petitioner now appeals.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The Petitioner argues that trial counsel was deficient for failing to investigate Mr. Bowers before he testified, insufficiently arguing during the motion to suppress hearing, and failing to object to Officer Kirby's "blood splatter" testimony. We initially note that the post-conviction court failed to specifically address the Petitioner's arguments regarding the motion to suppress and the failure to object to Officer Kirby's testimony. The post-conviction court only found that "trial counsel's failure to investigate Mr. Bowers prior to trial did not prejudice the defense of [the Petitioner]." The court did not specifically address any other arguments, and instead concluded that,

> [The] Petitioner ha[s] failed to demonstrate by clear and convincing evidence ineffective assistance of counsel in violation of a constitutional right to render his conviction and sentence void or voidable under the Post

Conviction Relief Act. Moreover, the Court finds the [P]etitioner's testimony not to be credible. Accordingly, the Court finds that [the] Petitioner has failed to show that he was prejudiced by counsel's allegedly deficient conduct.

## I. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

- 15 -

## A. Testimony of Anthony Bowers

The Petitioner argues that trial counsel was deficient in not investigating Mr. Bowers before he testified at trial. He further argues that trial counsel's cross-examination of Mr. Bowers "caused the defense more harm than would have no cross-examination at all." The Petitioner relies on Peoples v. Lafler, 734 F.3d 503 (6th Cir. 2013), for his apparent assertion that trial counsel's failure to impeach Mr. Bowers was per se ineffective assistance of counsel. However, the facts in Lafler greatly differ from those of the instant case. In Lafler, trial counsel was given a police report and other supporting documentation showing that two of that defendant's accomplices were lying about a particular fact of the crime, and trial counsel did not ask them about that fact or apparently even mention it in opening statement or closing argument. Further, the Lafler court specifically noted that trial counsel's whole strategy was to cast doubt on the credibility of the two accomplices, and his failure to impeach the two accomplices was therefore particularly harmful to the defense, even more so because the two accomplices' testimony was the only evidence linking that defendant directly to the actual crime. Lafler, 734 F.3d at 507, 513.

The Petitioner fails to recognize the important differences between Lafler and the instant case. As we have laid out, the post-conviction court found that trial counsel's failure to investigate Mr. Bowers did not prejudice him. The record supports such a conclusion. Although trial counsel did not impeach Mr. Bowers' claim that he was testifying because it was the right thing to do, he did reference his previous drug convictions and criminal history and during closing argument he portrayed Mr. Bowers as a "snitch and a liar" and told the jury not to be surprised if he sought a reduction in sentencing in exchange for his testimony. Further, although the Petitioner argues that trial counsel "actively worked to bolster the credibility of the prosecution's key witness[,]" the Petitioner ignores trial counsel's portrayal of Mr. Bowers as a "snitch and a liar" and his mentioning to the jury that it was possible Mr. Bowers would seek a reduction in his sentencing. Unlike the Lafler case, Mr. Bowers' testimony was not the only evidence the State possessed against the Petitioner, and Mr. Bowers received no actual benefit from his testimony, unlike the accomplices in Lafler. Although trial counsel might not have investigated Mr. Bowers as thoroughly as Ms. Morris suggested he should have, there is nothing in the record to suggest that the jury accredited Mr. Bowers' testimony or that the jury would have decided differently had trial counsel impeached Mr. Bowers in a different manner.

Finally, the Petitioner argues that the State's other evidence against him would not have been sufficient to sustain his conviction without Mr. Bowers' testimony, namely because the Petitioner's assertion that he acted in self-defense would not have been contradicted. However, as we have laid out, despite the Petitioner's claim to detectives

that he shot the victim in self-defense after the victim first fired a shot at him, there is no evidence that anyone but the Petitioner fired a gun. Further, the medical examiner, Dr. Deering, testified that the first shot to the victim was made from between six inches and two feet away, while the second, fatal shot was made from only six inches away, demonstrating that the Petitioner moved closer to the victim after the first shot, just as he stated to detectives. Dr. Deering testified that it was possible the first shot knocked the victim unconscious. Thus, the only evidence supporting the Petitioner's claim of self-defense is his own assertion. We agree with the post-conviction court's conclusion that the Petitioner did not suffer prejudice as a result of trial counsel's failure to impeach Mr. Bowers.

### B. Motion to Suppress

The Petitioner also argues that trial counsel was ineffective in failing to present proof at the motion to suppress hearing that the Petitioner was seized by detectives. Although the Petitioner asserts that trial counsel never talked to him about testifying at the suppression hearing, trial counsel testified that he told the Petitioner that this was an issue that would have required the Petitioner's testimony in light of the other evidence, namely the video of the Petitioner's interview and subsequent confession and the testimony of detectives. Trial counsel testified that the Petitioner elected not to testify at the suppression hearing, and trial cousnel was thus forced to rely on the other available evidence to support the argument that the Petitioner's confession should have been suppressed. He further testified that the Petitioner never discussed with him that detectives had used force. Instead, trial counsel affirmed that the video of the Petitioner's interview showed that he was not handcuffed and was allowed to leave the room and walk down the hall during the interview.

Contrary to the Petitioner's testimony at the post-conviction evidentiary hearing that Detective Wiser approached him with his hand on his gun, Detective Wiser testified that he did not remember having his hand on his gun and would have only done so in a dangerous situation, and Detective Wiser affirmed that his interaction with the Petitioner had been civil, not threatening. Detective Wiser also testified that Detective Windsor had spoken to the Petitioner about voluntarily coming to the police station to be interviewed. He also affirmed that it was not unusual for them to provide transportation to the police station to witnesses or victims. Further, Detective Wiser stated, and the Petitioner conceded, that the Petitioner had not been handcuffed in the patrol car or during the interview. Instead, he had been allowed to leave the interview and walk down the hall by himself.

Except for the Petitioner's own assertions, there is nothing in the record to support a finding that he was seized by detectives. In fact, even without any strong

evidence, trial counsel argued for suppression and presented a recently-decided case in support of the Petitioner.  Although he was not able to keep the Petitioner's confession out, he was able to keep graphic photographs of the victim's bullet wounds out.  Trial counsel testified that the Petitioner was unwilling to testify at the suppression hearing, despite his explanation of the necessity of doing so.  Without the Petitioner's testimony, trial counsel lacked the evidence necessary to present proof that the Petitioner was seized.  It is true that had the Petitioner's confession been suppressed, the State would have had a weaker case and, as Ms. Morris suggested, trial counsel would have been deficient if he unilaterally decided that the Petitioner would not testify at the suppression hearing.  However, the post-conviction court accredited the testimony of trial counsel and the detectives over that of the Petitioner.  The record suggests that trial counsel would have called the Petitioner to testify at the suppression hearing had he been willing, but even so, the testimony of the detectives and of trial counsel suggest that the Petitioner was not seized, regardless of whether or not he testified at the suppression hearing.  Further, this court noted on direct appeal that the Petitioner had conceded that he voluntarily met with the detectives at the police station.  See State v. James Allen Pollard, 2012 WL 4142253, at *13.  The Petitioner fails to establish that trial counsel's performance was deficient or that he suffered prejudice as a result of the alleged deficiency.

### C.  Testimony of Officer Wayne Kirby

The Petitioner also contends that trial counsel was ineffective in failing to object to Officer Kirby's testimony regarding blood spatter, despite his not being qualified as an expert witness.  As we have laid out, Officer Kirby testified that, based on his thirteen years of experience with the police department and his observations of blood spatter at the crime scene, he believed the victim was lying down on the ground when he was shot.  On appeal, the Petitioner raised the issue of the trial court's admission of Officer Kirby's testimony.  Because the Petitioner had not raised the issue in the trial court, this court utilized plain error analysis and found that no plain error existed.  See id. at *19.  This court specifically found that "Officer Kirby might not have been an expert in blood spatter; however, because [the Petitioner] did not object, there is not a sufficient basis to make that conclusion."  Id.  Because the post-conviction court did not address Officer Kirby's testimony, we review this issue de novo.

The Petitioner argues that "trial counsel was unable to provide any strategic explanation for why he failed to object" to Officer Kirby's testimony and "admitted that he had not read" the specific cases the Petitioner referenced.  Additionally, Ms. Morris testified that a non-deficient attorney would have objected to the testimony.  However, trial counsel testified that he chose not to object to Officer Kirby's testimony in order to "draw as little attention as possible" to his testimony that the victim was on the ground when he was shot and stated that his strategy was to "lessen the impact" of Officer

Kirby's testimony. He further testified that he had read "the digests" on blood spatter. Although the Petitioner seems to assume that trial counsel's objection would have kept Officer Kirby's testimony out completely, as this court noted on direct appeal, there is nothing in the record to support the conclusion that Officer Kirby undoubtedly would not have been qualified as an expert had trial counsel objected; in that scenario, the same testimony would have been introduced to the jury, except with the added impact of it coming from an expert witness. Moreover, the Petitioner offered no evidence of Officer Kirby's qualifications as an expert, or lack thereof, during the post-conviction evidentiary hearings.

The Petitioner further asserts that Officer Kirby's testimony was "the only direct evidence (other than the testimony of Mr. Bowers), which directly cast doubt on [the Petitioner]'s claim" that he shot the victim while they were struggling. However, the Petitioner's own version of events in his reply brief state that, during his interview with detectives, "[The Petitioner] demonstrated how [the victim] immediately fell to the ground following the first shot . . . and . . . [the Petitioner] fired a second shot into the left side of his head." Though the Petitioner questioned trial counsel as to why he would "let[] proof come out that [the victim] was effectively executed lying on the ground[,]" he fails to realize that his own version of events demonstrated such a scenario. The Petitioner again fails to establish that trial counsel's performance was deficient or that he suffered prejudice as a result of the alleged deficiency.

## II. Cumulative Error

The Petitioner requests this court to consider the cumulative effect of the errors he has alleged above in deciding whether to grant him relief in this post-conviction appeal. Because we have found no single instance wherein trial counsel was deemed ineffective, there is no basis to conclude that any cumulative error resulted in an unfair trial.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the dismissal of the petition.

_____
ALAN E. GLENN, JUDGE

- 19 -